IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ELAVON, INC., formerly known as NOVA INFORMATION SYSTEMS, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:09-cv-0139-GET |
| v. | ) ) | |
| WACHOVIA BANK, NATIONAL ASSOCIATION; WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A., | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Elavon, Inc., formerly known as NOVA Information Systems, Inc., ("NOVA"), brings this Complaint against defendants Wachovia Bank, National Association ("Wachovia Bank") (collectively, Wachovia Bank and Wachovia Corporation shall be referred to as "Wachovia"), and Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively "Wells Fargo"), stating:

## INTRODUCTION AND SUMMARY

1.      Plaintiff NOVA processes credit card, debit card, and other transactions for merchants.  As one source of accessing prospective customers, it enters into alliance referral agreements with banks.  This action arises from Wachovia's wrongful termination without cause of its longstanding, multimillion-dollar, arms-length alliance ("the Wachovia Alliance"), entered into with the advice of counsel, to refer its merchant customers exclusively to NOVA for a definite term ending no earlier than year-end 2012.  The Wachovia Alliance – which has resulted in hundreds of millions of dollars in payments to Wachovia – is the largest of its kind for NOVA and accounts for a significant amount of NOVA's North American revenue.  The unlawful termination denies NOVA the benefit of a valuable, bargained-for referral stream.  Irreparable harm has resulted and will result to NOVA if the termination is not enjoined, exactly the remedy stipulated to by the parties in their contract.

2.      Wachovia provided notice of the purported termination on December 31, 2008, the day of its approximately $15 billion merger with Wells Fargo ("the Merger"), less than five months after the parties had

agreed to a four-plus year extension of their thirteen-year old alliance. Wachovia's "Termination Notice" did not, nor could it, list any default by NOVA (none had occurred). Rather, it cited the Merger as the termination-triggering event. The Defendants evidently had decided the Agreement no longer would be convenient once they joined forces because it would require both the Wachovia and Wells Fargo banking defendants to refer merchants exclusively to NOVA, prevent the Defendants from referring merchants to non-NOVA processors, and preclude Wells Fargo from continuing to engage in its existing joint venture with a third party in the merchant processing business. Indeed, prior to the attempted termination, Wells Fargo's Executive Vice President stated that Defendants would be in breach of the Wachovia Alliance agreement immediately upon the Merger's consummation.

3.     The purported termination ignored the contract's termination provisions. Although the parties' alliance agreement included an entire Article IV – appropriately entitled "Term and Termination" – that expressly enumerated the limited conditions warranting its termination, Wachovia's Termination Notice did not cite to that Article at all. Nor would Wachovia

have had any basis to do so.  Article IV did not provide for termination by
Wachovia in the event of its merger.  And none of the four specified for-
cause conditions that would trigger Wachovia's termination rights were
applicable.

      4.      Lacking any justification under the contract's termination
section, Wachovia's notice instead located its purported termination right in
Article II – dealing with "Financial Terms."  However, Article II does not
authorize Wachovia to terminate under any circumstance, much less for a
change in control involving Wachovia.  The particular section in Article II
cited by Wachovia merely provides for Wachovia to return various pre-
payments (without limitation to other damages) in the event of a valid
termination.  Nowhere does the payment section create a new right of
termination; rather, it is merely derivative of the termination rights otherwise
existing, namely those for-cause rights enumerated in Article IV.  Reading it
to breathe a substantive new at-will termination right into the Agreement not
only would render superfluous the for-cause termination provisions set forth
in Article IV but also eviscerate the parties' express provision in Article

XVII for injunctive relief, particularly specific performance, in the event of an attempted contract breach.

5.    Wachovia's purported termination is plainly invalid.

6.    Although Wachovia sent the Termination Notice, thereby breaching the contract, Wells Fargo tortiously induced this result and conducted bad-faith discussions with NOVA to secure it.  As a result of the Merger, Wachovia Corporation merged into Wells Fargo & Company, with Wells Fargo & Company surviving the Merger and now controlling Wachovia Bank.  Wachovia knew at the time it sent the Termination Notice that Wells Fargo & Company would be the controlling entity upon the consummation of the Merger.  Upon information and belief, Wells Fargo either made the decision that Wachovia would send the Termination Notice or induced Wachovia to do so.  For years, trust and cooperation have defined the alliance between Wachovia and NOVA.  Wells Fargo exploited that good will, proposing to NOVA shortly after the Merger announcement in October 2008 that the parties enter into a stand-still agreement to permit full discussions of an expanded relationship and then repeatedly pledging its continued commitment to that approach during the weeks that followed, only

then to induce Wachovia abruptly to "terminate" the Alliance Agreement on the day of the Merger. Upon information and belief, this was the result that Wells Fargo intended weeks before the Merger but concealed from NOVA.

7.    The wrongful termination carries dire consequences for NOVA. NOVA's hard-earned reputation, forged through years of exemplary customer service, has been irreparably damaged, and continues to be so, by the attempted termination. And NOVA will suffer approximately $1 billion or more in damages that will be difficult to calculate fully if the termination is not enjoined.

8.    NOVA brings this action for breach of contract and tortious interference with contractual relations. NOVA seeks exactly what the contract provided for in these circumstances – injunctive relief to prevent the contract termination, secure compliance with Defendants' affirmative referral obligations, and enforce the non-competition covenants binding Defendants. NOVA also seeks to recover its damages and costs.

## THE PARTIES

9.    Plaintiff NOVA is a corporation organized under the laws of Georgia with its principal place of business in Atlanta, Georgia, in the merchant processing business.

10.    On information and belief, Defendant Wachovia Bank, National Association, is a national banking association with its designated main office in North Carolina.  On information and belief, as a result of the Merger, it is a subsidiary of Wells Fargo & Company.

11.    On information and belief, Defendant Wells Fargo & Company is a corporation organized under the laws of Delaware with its principal place of business in California.

12.    On information and belief, Defendant Wells Fargo Bank, N.A., is a national banking association with its designated main office in South Dakota.

## JURISDICTION

13.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship

exists between plaintiff and all defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest, costs, and attorneys' fees.

14.     The Court has personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91 and the United States Constitution.  In addition, Wachovia consented in the Alliance Agreement (§ 17.8) to suit in any court of the United States, and that provision is binding on Wells Fargo pursuant to the Agreement's successor provision (§ 17.5) and otherwise.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a). In addition, Wachovia consented in the Alliance Agreement (§ 17.8) to suit in any court of the United States, and that provision is binding on Wells Fargo pursuant to the Agreement's successor provision (§ 17.5) and otherwise.

## FACTS

### The Merchant Processing Business

16.     NOVA is one of the nation's five largest merchant processors in terms of transaction volume processed.  It provides full-service merchant processing services to approximately 870,000 merchant locations in North America.

17.    Merchant processing is a high volume, low profit-margin business.  In order to maintain a large transaction volume, NOVA enters into referral agreements with various entities, including more than 1,500 banks.

18.    Banks are attracted to this referral arrangement for a variety of reasons, including the opportunity to save the infrastructure costs and credit risks involved in processing merchant transactions, the steady revenue stream offered from referral royalties, and NOVA's high customer service standards, global footprint, and capability to fulfill all of a customer's merchant processing needs.  In short, the arrangement enables the bank to focus on its core business while still offering its customers a full suite of services.

### The Alliance Agreement

19.    The Wachovia Alliance has benefited both parties, accounting for a significant amount of NOVA's North American revenue in 2008 while generating very lucrative payments for Wachovia.

20.    The Alliance originated in 1995 when NOVA entered into a marketing agreement with First Union Bank, which changed its name to Wachovia Corporation following a 2001 acquisition.

21.     In connection with the Wachovia/First Union merger, Wachovia and NOVA entered into, effective August 1, 2002, the Amended and Restated Alliance Relationship Agreement ("the Original Restatement"). The parties subsequently amended the Restatement four times effective March 1, 2004 (First Amendment), January 1, 2005 (Second Amendment), February 19, 2005 (Third Amendment), and July 31, 2008 (Fourth Amendment). The Restatement and four amendments collectively shall be referred to as "the Alliance Agreement" or "the Agreement" and constitute a valid and binding agreement.

22.     The Agreement (§ 17.6) provides that it shall be governed by and construed in accordance with the Laws of the State of Georgia. Section 16.2 provides for the recovery by NOVA of its attorney's fees and expenses, along with other items, resulting from any breach by Wachovia of the Agreement.

23.     At all relevant times, Plaintiff has performed the terms of the Agreement in the manner specified.

24.     The Agreement imposes numerous obligations on the parties, including the following:

### A.    <u>Wachovia's Marketing and Referral Obligations</u>

25.    The Agreement (§ 5.1) requires Wachovia Bank as well as any banking subsidiary of Wachovia Corporation or its successor to refer and market exclusively to NOVA any merchants and other entities evidencing an interest in merchant processing services.  If the referred entity subsequently enters into a merchant agreement with NOVA, then NOVA owns the agreement and the resulting relationship.

26.    As a result of these provisions, Wachovia has supplied a steady stream of referrals to NOVA, referrals that could reliably be anticipated and that necessitated NOVA to build a large infrastructure to support.  By the end of 2008, NOVA customer locations attributable to the Wachovia Alliance numbered nearly 90,000.

27.    Because a breach of the referral obligation would cause irreparable harm to NOVA and because a remedy at law would be inadequate, Wachovia agreed in Section 17.8 of the Agreement that NOVA "shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof," in addition to all other available remedies.

B.     **Defendants' Non-Competition and Non-Solicitation Obligations**

28.     Adding to the affirmative referral exclusivity obligation, the Agreement also includes non-competition and non-solicitation provisions.

29.     Respecting competition, Wachovia agreed in Section 14.2(a) that, during the term of the Agreement, neither Wachovia nor its affiliates would solicit merchant processing business on their own behalf, compete with NOVA in the provision of merchant processing services in the United States, or refer any potential merchant processing customer to anyone other than NOVA, as follows:  "[neither Wachovia nor its] Affiliates or direct or indirect subsidiaries, shall directly or indirectly, . . . (i) engage or participate, directly or indirectly, in the Merchant Business in the United States, except for the benefit of NOVA and the Wachovia Alliance as specifically provided in, and in strict compliance with the terms of, this Agreement, or under an exception to such exclusivity specifically set forth in this Agreement; or (ii) provide Merchant Services in the United States to any Person, or facilitate, refer, solicit, or otherwise participate or engage in the provision of Merchant Services in the United States to any Person, directly or indirectly, except for the benefit of NOVA and the Wachovia Alliance as specifically provided in,

and in strict compliance with the terms of, this Agreement, or under an exception to such exclusivity specifically set forth in this Agreement."

30.     Respecting solicitation, Wachovia agreed in Section 14.2(b) that during the term of the Agreement and for two years thereafter neither Wachovia nor their affiliates would directly or indirectly solicit a wide range of entities defined in the Agreement, including but not limited to NOVA customers resulting from the Wachovia Alliance.

31.     By virtue of the Agreement's successor provision (§ 17.5) and otherwise, these non-competition and non-solicitation covenants extend not only to affiliates of Wachovia but also to any successor to Wachovia and the successor's affiliates.

32.     In Section 14.3, Wachovia acknowledged that these non-competition and non-solicitation restrictions were necessary and reasonable to protect NOVA:

> [T]he restrictions set forth in [Section 14.2] hereof are reasonable and necessary to protect the legitimate business interests of NOVA, and are reasonable and necessary to protect the goodwill and other value of the Merchant Business of NOVA and the benefits bargained for by NOVA under this Agreement.   Each of Wachovia Corporation and Wachovia further acknowledges

and agrees that the restrictions set forth in [Section 14.2] hereof are narrowly drawn, are fair and reasonable in time and territory, and place no greater restraint upon [Wachovia] than is reasonably necessary to secure the goodwill and other value of the Merchant Business of NOVA and the benefits bargained for by NOVA under this Agreement.

33.     Because a breach of the non-competition or non-solicitation covenants would cause irreparable harm to NOVA and because a remedy at law would be inadequate, Wachovia agreed in Section 14.4 that any such breach would entitle NOVA to "equitable relief, including but not limited to, injunctive relief" as well as "money damages insofar as they can be determined."

## C.     The Parties' Obligation to Develop Dedicated Teams

34.     In order to further the objectives of the Wachovia Alliance, the Agreement (§ 6.3) requires the parties to cooperate in establishing and training sales, customer service, and other teams that will be dedicated exclusively to the Wachovia Alliance.

35.     At considerable cost, NOVA has developed a large infrastructure to service and grow the Wachovia Alliance portfolio.

36.     NOVA also has shared confidential information and trade secrets with Wachovia, including its business models and marketing strategies, customer lists, and monthly revenue, expense, and other financial data.

### D.     NOVA's Payment Obligations

37.     In exchange for performing its various marketing and referral obligations, Wachovia has benefited from substantial payments by NOVA pursuant to Sections 2.1 through 2.6 of the Agreement.

38.     Since the inception of the Original Restatement, NOVA has paid Wachovia hundreds of millions of dollars in upfront payments, extension payments, referral fees, royalties, revenue growth incentive payments, program support payments to help Wachovia offset its marketing costs, and payments to subsidize Wachovia's operational expenses.

39.     NOVA has invested heavily in this relationship.

### Wachovia's Wrongful Termination

40.     In order to protect both parties' investment, the parties provided that the Alliance Agreement, including but not limited to Wachovia's referral and non-competition obligations, would remain in place for a

specified and definite duration.  When Wachovia purported to terminate the Agreement by letter dated December 29, 2008, it breached that provision.

41.    The Original Restatement in 2002 provided for an initial term of five years through July 31, 2007.  The Second Amendment extended the term until July 31, 2009.  The Fourth Amendment extended the minimum term of the agreement through December 31, 2012.

42.    The Agreement provides for termination prior to 2012 only under the exclusive for-cause conditions specifically enumerated in Article IV – "Term and Termination."  Pursuant to Section 4.3, Wachovia is permitted to terminate the Agreement only if one of four conditions exists:

> (i) a material default by NOVA in the performance of its material obligations provided that said default is not cured within the specified period following proper notifications and any factual dispute concerning whether the termination is justified has been resolved under the applicable dispute resolution procedure;
>
> (ii) a failure by NOVA to pay a material amount due and payable (subject to a similar proviso above in (i));
>
> (iii) either NOVA or its parent company (US Bancorp) experiences a change in control; or
>
> (iv) NOVA suffers a voluntary bankruptcy as defined.

43.    Neither Article IV nor any other provision in the Alliance Agreement provided for termination by Wachovia either in the event of a change in control of Wachovia or without cause.  The lack of any change of control termination right was intentional, as the parties contemplated this very situation.  They expressly agreed that a Wachovia change in control would warrant termination by <u>NOVA</u>, but they excluded it as a basis for termination by Wachovia.

44.    Several other sections in the Agreement confirm that termination is a limited right exercisable only in certain specific circumstances not present here.  For example, in the event of a change in control of NOVA, section 4.3 specifies that Wachovia's resulting "right" to terminate lapses after a specified period.  Similarly, the parties agreed to a dispute resolution procedure under section 4.5 that would decide whether certain attempted terminations were "justif[ied]"; if deemed unjustified, the attempted termination would have no effect.  These examples further confirm that no at-will termination right exists.

45.    Reading the Agreement to permit without-cause terminations also would conflict with the express provision in Section 17.8 for specific

performance.  Because "irreparable damage would occur in the event that any of the provisions of this Agreement is not performed in accordance with its specific terms or is otherwise breached," the parties agreed that they "shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction."  This clause would be meaningless if the parties simply could terminate without cause.

46.     In its termination letter, Wachovia cited two sections of the Agreement – §§ 17.2 and 2.10.  Neither section authorizes Wachovia to terminate under any circumstance, much less for a change in control involving Wachovia.

47.     Section 17.2 is simply the notice provision governing how and to whom to send formal notices under the contract.  It does not relate to the proper grounds for termination.

48.     Section 2.10 (formerly numbered § 2.11 in the Original Restatement) addresses the pro rata return to NOVA of certain pre-paid extension and program support monies in the event of a proper termination except in the event that termination was the result of certain specified

breaches by NOVA, which did not occur here.  Its application is triggered by a proper termination; it does not itself establish any termination right.  Only Article IV of the Agreement establishes termination rights.  Nor is Section 2.10 a liquidated damages provision.  It merely addresses the repayment of pre-paid funds in the event of a proper termination.

### The Consequences to NOVA from the Wrongful Termination

49.    Wachovia's wrongful termination has caused and continues to cause substantial and irreparable injury to NOVA.  Further injury should be precluded through preliminary and permanent injunctive relief, as provided for in the Alliance Agreement.  To the extent the violations continue, damages insofar as they can be determined include but are not limited to the following:

50.    First, as a result of the purported termination, Wachovia Bank and Wells Fargo Bank, N.A., are violating their obligations to refer merchants and other entities exclusively to NOVA.  Because Wells Fargo & Company was the surviving entity in its merger with Wachovia Corporation, it has assumed the obligations of and replaced Wachovia Corporation under

the Agreement by virtue of the Agreement's successor provision (§ 17.5) and otherwise.

51.    The marketing and referral obligations in Sections 5.1(a)-(b), among others, expressly apply to Wachovia Bank and any banking subsidiary of Wachovia Corporation.  Because Wells Fargo & Company has succeeded Wachovia Corporation and because Wells Fargo Bank, N.A., is a banking subsidiary of Wells Fargo & Company, the referral obligations now apply to Wells Fargo Bank, N.A. (as well as any other Wells Fargo & Company banking subsidiaries), in addition to Wachovia Bank.

52.    In addition, as a result of the unlawful purported termination, the attrition rate on NOVA's existing customers attributable to the Wachovia Alliance is and will be significantly higher during the term of the Agreement than it would otherwise be.

53.    Second, as a result of the Merger and purported termination, both Wachovia Bank and Wells Fargo are violating the non-competition and non-solicitation covenants found in Section 14.2.

54.    As a result of the Merger, the non-competition and non-solicitation restrictions apply not only to Wachovia Bank but also to both

Wells Fargo defendants.  They apply to Wells Fargo & Company because it is the successor to Wachovia Corporation.  In addition, they apply to both Wells Fargo & Company and Wells Fargo Bank, N.A. because those entities are "Affiliates" of Wachovia and the restrictions expressly apply to "Affiliates."   Pursuant to Article I of the Agreement, an "Affiliate" of Wachovia includes "any other Person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with" Wachovia.  By virtue of the merger, Wachovia Bank is directly or indirectly "controlling, controlled by or under common control with" both Wells Fargo defendants.

55.    On information and belief, Defendants and/or their agents are violating the non-competition covenants by referring merchants to First Data Corporation for merchant processing services and/or by engaging in the merchant processing business through a joint venture between Wells Fargo and First Data Corporation.  But for the breach of the non-competition covenants, Defendants would be referring the merchants at issue to NOVA.

56.    On information and belief, Defendants are violating the non-solicitation covenant by soliciting NOVA customers derived from the Wachovia Alliance and other covered entities.

57.    In sum, in the event the numerous violations continue, damages are difficult to calculate fully but insofar as they can be calculated will total approximately $1 billion or more.

### Wells Fargo's Bad-Faith Following the Merger Announcement

58.    Although Wachovia sent the Termination Notice, Wells Fargo tortiously induced this breach and caused NOVA to delay moving to enjoin the anticipated breach of the Agreement through discussions with NOVA that were conducted in bad faith.

59.    On October 3, 2008, Wells Fargo and Wachovia Corporation announced their planned merger.

60.    Shortly thereafter, NOVA initiated what it understood to be good-faith discussions with Wells Fargo regarding a future expanded relationship beyond even that provided for under the Agreement by virtue of the "Affiliates" provisions.  Unless otherwise noted, all of the dates discussed in ¶¶ 61-76 below occurred in 2008.

61.    NOVA's discussions with Wells Fargo started promisingly enough, or so it appeared to NOVA.  On or about October 30, Chief Executive Officer of NOVA's Global Acquiring Solutions, Stuart C. Harvey, Jr., met with Wells Fargo's Executive Vice President and General Manager of Merchant Payment Solutions, Debra Rossi.  The two executives lead their company's merchant processing alliance divisions.  They discussed options for an expanded mutual relationship in light of the prospective merger.  In addition, Ms. Rossi told Mr. Harvey that First Data Corporation had contacted her upon the announcement of the planned Wells Fargo/Wachovia merger to discuss a potential deal involving future referrals by the Wachovia branch network but that she had told First Data Corporation that the Wachovia business was unavailable due to contractual obligations.

62.    On or about November 4, Wells Fargo requested and received NOVA's consent to review a copy of NOVA's confidential Alliance Agreement.  This was a substantial show of good faith in light of Wells Fargo's position as a competitor of NOVA.

63.    In a follow-up conference call on November 6, Mr. Harvey and Ms. Rossi, joined by other representatives from their companies, discussed structural options for an expanded relationship.

64.    On November 11, the parties met in San Francisco to continue their discussions.  Near the end of that meeting, Ms. Rossi stated that, when the merger is consummated, Wells Fargo "will be in breach of both agreements," referring to its agreements with First Data Corporation and NOVA.  She congratulated NOVA for negotiating a phenomenal contract that included no "divorce clause."

65.    During the San Francisco meeting, <u>Wells</u> <u>Fargo</u> requested that the parties enter into an extension agreement to provide a sufficient opportunity to discuss an expanded future relationship without the December 31 merger date looming over their discussions.  In a spirit of good faith, NOVA agreed to the proposal.

66.    On November 19, Mr. Harvey sent to Ms. Rossi at Wells Fargo a draft letter agreement proposing a negotiating window and corresponding stand-still agreement through February 28, 2009, with respect to the parties' respective positions.  Ms. Rossi responded the next day that she could not

sign the extension letter because of unidentified objectionable assertions but proposed a discussion between the parties after Thanksgiving regarding next steps.

67.     On November 25, Wells Fargo and NOVA conducted that conference call, and Ms. Rossi followed up the next day by asking whether NOVA would consider a joint venture with Wells Fargo.

68.     On December 2, following up on the prior week's call, the attorneys for each side (Wells Fargo's in-house counsel and NOVA's outside counsel) agreed that both parties were interested in pursuing further discussions of an expanded relationship and accordingly discussed revisions to the extension letter.  On December 3, NOVA's attorney sent to Wells Fargo's attorney a revised extension letter consistent with their discussion. Thereafter, despite repeated assurances otherwise, Wells Fargo never provided written comments on the extension letter.

69.     On December 4, Wells Fargo's attorney indicated by email to NOVA's attorney that he hoped to provide comments that day.  In a December 5 email, he wrote that the comments should be forthcoming in a new draft by December 8.  During a call on December 8, he stated that he

expected to send the new draft by December 9 and reaffirmed that Wells

Fargo remained interested in conducting good-faith discussions relating to

an expanded relationship.  On Wednesday, December 10, he emailed

NOVA's counsel that he now expected to send comments by the end of the

week.

70.    Meanwhile, Ms. Rossi provided similar assurances to Mr.

Harvey.  On December 8, she emailed him that "[w]e are moving along fine

on the non-compete waiver extension.  We hope to sign something by the

end of this week."  And on December 10, in response to a request for an

update on the extension letter, she promised based on her discussions with

Wells Fargo's in-house counsel that Wells Fargo would send the extension

agreement to NOVA on December 15 "at the latest."

71.    At this time, Wachovia and NOVA continued to plan for their

joint business operations in 2009.  On December 15, representatives from

NOVA and Wachovia met in North Carolina to discuss status and agreed to

proceed with business as usual.  Wachovia invited NOVA to join a January

6, 2009 meeting in Atlanta to strategize better penetration of certain

Wachovia accounts.

72.     On both December 16 and 17, NOVA's counsel again requested a status update from Wells Fargo's attorney.  Once again, when Wells Fargo's attorney responded on December 18, he pushed the timetable back:  "sorry for delay. . . . We are discussing internally and hope to have more direction by next week."  In response, NOVA's attorney on December 18 left a voicemail for Wells Fargo's attorney followed up by an email reaffirming NOVA's commitment to continue to act in good faith based on prior discussions of mutual cooperation and asking the Wells Fargo attorney to let him know immediately if Wells Fargo's commitment to that approach had changed.  The Wells Fargo attorney did not respond.

73.     On December 17, Mr. Harvey asked Ms. Rossi for an update on the extension letter.  On Saturday, December 20, Mr. Harvey emailed Ms. Rossi asking for "5 minutes."  She responded by asking instead to speak "next week."  She did not propose a specific time or date.

74.     On Monday, December 22, Ms. Rossi left a voicemail for Mr. Harvey proposing to re-connect after Christmas but once again did not propose a specific time or date.  Mr. Harvey's call to request same was not returned.

75.     On December 26, Mr. Harvey sent both an email and voicemail to Ms. Rossi explaining the urgency of finalizing the extension agreement prior to the December 31 merger date.  He received no response.

76.     On December 30, Ms. Rossi called Mr. Harvey to inform him that he would be receiving a termination "notice" letter the next day – the day of the scheduled merger.

**NOVA's Response to Termination Notice**

77.     On January 5, 2009, because Wachovia's attempted termination was unlawful and invalid, NOVA sent a letter to Wachovia and copying Wells Fargo.  The letter stated that the Alliance Agreement remained in full force and effect and that Wachovia and Wells Fargo as its affiliate were expected to perform their obligations under the Agreement through the full term.

**COUNT I**
**For Breach of Contract**
**(Against All Defendants)**

78.     Plaintiff NOVA realleges and incorporates by reference Paragraphs 1 through 77 of the Complaint.

79.    The Alliance Agreement provides for a term through at least December 31, 2012.

80.    The Agreement authorizes termination by Wachovia only for the reasons specified in Section 4.3, none of which is applicable here.

81.    The Agreement does not provide Wachovia any right to terminate due to a change in control of Wachovia or without cause, and the existence of other change of control provisions in the termination section makes clear that no such right exists.  Wachovia nonetheless purported to terminate the Agreement effective upon the merger of Wachovia and Wells Fargo that was consummated on December 31, 2008.

82.    Wachovia's attempted termination constitutes and has resulted in a complete breach of the Alliance Agreement, including Defendants' affirmative obligations to refer merchants exclusively to NOVA for merchant processing services and otherwise to market NOVA's services.

83.    Defendants further have breached Sections 14.2(a)-(b) of the Alliance Agreement because they have engaged in merchant processing services, have referred merchants and other entities to merchant processors

other than NOVA for merchant processing services, and have directly or indirectly solicited covered entities.

84.    NOVA has suffered and will continue to suffer irreparable harm as a result of the elimination of marketing and referrals by Defendants, the loss of reputation and goodwill, and the improper competition by Defendants, among other forms of irreparable harm.

85.    Because of the difficulty of ascertaining the full amount of monetary damages, NOVA has no adequate remedy at law.

86.    The parties agreed at Sections 14.4 and 17.8 that NOVA shall have the right to seek specific performance of the Alliance Agreement.

87.    As a direct and proximate result of the breaches, NOVA has suffered and is continuing to suffer damages that are difficult to calculate fully but are approximately $1 billion or more.

## COUNT II
### For Tortious Interference with Contractual Relations
### (Against Wells Fargo)

88.    Plaintiff NOVA realleges and incorporates by reference Paragraphs 1 through 87 of the Complaint.

89.     On October 3, 2008, Wachovia and Wells Fargo announced their planned merger.

90.     On or about November 4, 2008, Wells Fargo was provided access to a copy of the Alliance Agreement by Plaintiff.

91.     Wells Fargo read and understood the Alliance Agreement, particularly the provisions governing termination of the Agreement.

92.     Prior to the Merger, including by draft letter on November 19, 2008, Wells Fargo was informed by NOVA that as a result of the Merger Wells Fargo would become subject to certain covenants and obligations under the Alliance Agreement, including obligations not to engage in the merchant processing business nor to refer merchants and other entities to merchant processors other than NOVA.

93.     On or about November 11, 2008, Wells Fargo's Debra Rossi confirmed that Wells Fargo and Wachovia would be in breach of the Alliance Agreement upon consummation of the Merger and that Defendants lacked a termination right under these circumstances.

94.     Upon information and belief, with deliberate disregard for NOVA's rights under the Alliance Agreement, Wells Fargo caused and/or

encouraged Wachovia to send a notice purporting to terminate the Alliance Agreement upon consummation of the Merger.

95.    Wells Fargo's conduct has caused Wachovia to breach the Alliance Agreement in its entirety through a wrongful termination, resulting in the frustration of NOVA's contract rights relating to marketing and referrals by Wachovia, non-competition and non-solicitation by Wachovia, and otherwise.

96.    As a direct and proximate result of Wells Fargo's conduct, NOVA has suffered and is continuing to suffer damages that are difficult to calculate fully but are approximately $1 billion or more and to suffer irreparable injury and incalculable damage to its relationships with customers and prospective customers and its goodwill.

97.    Wells Fargo's conduct is knowing, willful, malicious, and unjustified and constitutes tortious interference with NOVA's contractual relations with Wachovia.

## COUNT III
### For Attorneys' Fees and Expenses of Litigation
### (Against All Defendants)

98.     Plaintiff NOVA realleges and incorporates by reference Paragraphs 1 through 97 of the Complaint.

99.     Through their conduct described herein, Defendants have acted in bad faith, have been stubbornly litigious, and have caused NOVA unnecessary trouble and expense.

100.    NOVA is entitled to recover its attorneys' fees and expenses of litigation from Defendants pursuant to O.C.G.A. § 13-6-11 and the Agreement.

## COUNT IV
### For Punitive Damages Pursuant to O.C.G.A. § 51-12-5.1
### (Against Wells Fargo)

101.    Plaintiff NOVA realleges and incorporates by reference Paragraphs 1 through 100 of the Complaint.

102.    Through the conduct described herein, Wells Fargo has demonstrated "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences" within the meaning of O.C.G.A. § 51-12-5.1.

103. NOVA is entitled to recover punitive damages from Wells Fargo in an amount to be determined by the enlightened conscience of an impartial jury pursuant to O.C.G.A. § 51-12-5.1.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff NOVA respectfully seeks judgment against the Defendants as follows:

A.    Preliminary and permanent injunction preventing Wachovia's wrongful termination of the Alliance Agreement and ordering Defendants to perform their affirmative referral and other obligations under the Agreement (Counts I and II);

B.    Preliminary and permanent injunction preventing Defendants from referring directly or indirectly any merchants to First Data Corporation or any other non-NOVA entity for merchant processing services, from engaging directly or indirectly in any merchant processing services, and from soliciting any covered entities in violation of the non-competition and non-solicitation covenants (Counts I and II);

C.    Preliminary and permanent injunction either (i) preventing Defendants from merging Wachovia Bank into any Wells Fargo entity or (ii) to the extent such a merger has occurred or occurs prior to court relief, ordering said Wells Fargo entity to perform all of Wachovia Bank's covenants and obligations under the Agreement (Counts I and II);

D.    Preliminary and permanent injunction requiring Wells Fargo to divest its interest in any joint venture with First Data Corporation regarding the merchant processing business (Counts I and II);

E.      For money damages of approximately $1 billion or more for Defendants' breaches of contract (Count I);

F.      For money damages of approximately $1 billion or more for Wells Fargo's tortious interference (Count II);

G.      Preliminary and permanent injunction preventing Wells Fargo from tortiously interfering with NOVA's contract with Wachovia (Count II);

H.      For punitive damages in an amount to be determined at trial for Wells Fargo's knowing, willful, and unjustified tortious interference with NOVA's contract with Wachovia (Count II);

I.      For prejudgment interest as may be appropriate;

J.      For NOVA's costs in this action, including its reasonable attorney's fees and expenses of litigation; and

K.      For such other and further relief as the Court deems just and proper.


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Respectfully submitted, this 27th day of January, 2009.

FELLOWS LABRIOLA LLP

/s/Henry D. Fellows, Jr.
Henry D. Fellows, Jr.
Georgia Bar No. 257825
Kevin P. Weimer
Georgia Bar No. 745979

Peachtree Center
Suite 2300 South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303-1731
(404) 586-9200 (phone)
(404) 585-9201 (facsimile)
hfellows@fellab.com
kweimer@fellab.com

Attorneys for Plaintiff
ELAVON, INC.


OF COUNSEL:

WILLIAMS & CONNOLLY LLP
Bruce R. Genderson
Edward C. Barnidge
Scott K. Dasovich
725 12th Street, N.W.
Washington, D.C.  20005
202-434-5000 (phone)
202-434-5029 (facsimile)

(*Pro Hac Vice* applications pending)